Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/31/2020 08:06 AM CST

State of Nebraska, appellee, v.
Brandon J. Weathers, appellant.

___ N.W.2d ___

Filed November 8, 2019.    No. S-18-665.

1. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.

2. **Effectiveness of Counsel: Appeal and Error.** An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

3. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

4. **Right to Counsel: Appeal and Error.** A trial court's decision to sustain or overrule a defendant's motion to dismiss appointed counsel and appoint substitute counsel is reviewed for an abuse of discretion.

5. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

6. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

7. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

8. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

9. ____: ____. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

10. **Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

11. **Effectiveness of Counsel: Presumptions: Proof.** The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable.

12. **Effectiveness of Counsel: Proof: Appeal and Error.** When an ineffective assistance of counsel claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

13. ____: ____: ____. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal.

14. **Effectiveness of Counsel: Records: Appeal and Error.** Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial.

15. ____: ____: ____. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice.

16. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

17. **Claims.** A claim insufficiently stated is no different from a claim not stated at all.

18. **DNA Testing: Convictions.** The requirement for a convicted felon to provide a DNA sample pursuant to Neb. Rev. Stat. § 29-4106(1)(a) (Reissue 2016) exists once the convicted felon begins serving his or her sentence.

19. ____: ____. Neb. Rev. Stat. § 29-4106 (Reissue 2016) inherently authorizes the use of reasonable force to collect a DNA sample from a convicted felon.

20. **Criminal Law: Trial: Evidence.** Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.

21. ____: ____: ____. Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading.

22. **Evidence.** Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.

23. **Trial: Evidence.** Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis.

24. **Right to Counsel.** When a defendant becomes dissatisfied with court-appointed counsel, unless he or she can show good cause to the court for the removal of counsel, his or her only alternative is to proceed pro se if he or she is competent to do so.

25. ____. An indigent defendant's right to have counsel does not give the defendant the right to choose his or her own counsel.

26. ____. Mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel.

27. **Right to Counsel: Waiver: Effectiveness of Counsel.** Appointed counsel must remain with an indigent accused unless one of the following conditions is met: (1) The accused knowingly, voluntarily, and intelligently waives the right to counsel and chooses to proceed pro se; (2) appointed counsel is incompetent, in which case new counsel is to be appointed; or (3) the accused chooses to retain private counsel.

28. **Right to Counsel.** Once a defendant requesting substitute counsel has raised a seemingly substantial complaint about counsel, the court has a duty to thoroughly inquire into the complaint.

29. **Postconviction: Effectiveness of Counsel: Records: Appeal and Error.** When an appellate court finds, on direct appeal, that the record is not sufficient to resolve a claim of ineffective assistance, it should not be misunderstood as a finding that the claim will necessarily require an evidentiary hearing if raised in a motion for postconviction relief, because that determination is governed by an entirely different standard.

30. ____: ____: ____: ____. Just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim.

Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Miller-Lerman, J.
## NATURE OF CASE
Brandon J. Weathers appeals his convictions in the district court for Douglas County for four counts of first degree sexual assault. Weathers, who has new counsel on direct appeal, claims that his trial counsel provided ineffective assistance in

various respects, including in failing to adequately challenge the admission of DNA evidence that linked him to the assaults and that he claims was obtained in violation of his constitutional rights and in violation of statutory limitations on the use of DNA samples. He further claims, independent of his ineffective assistance of counsel claims, that admission of the DNA evidence was plain error. Weathers also claims that the district court erred when it refused to remove his counsel and appoint new counsel after he asserted that his counsel had a conflict of interest and had performed deficiently in other respects. We affirm Weathers' convictions and sentences.

STATEMENT OF FACTS

In 2014, Weathers was being investigated for sexual assault of a child in a case unrelated to the charges in the present case. Police obtained a DNA sample from Weathers in connection with the investigation of the 2014 assaults. Following a trial in December 2015, Weathers was convicted of two counts of first degree sexual assault of a child based on the 2014 assaults, and the district court sentenced Weathers to two consecutive terms of imprisonment for 50 to 80 years. The Nebraska Court of Appeals affirmed Weathers' convictions and sentences for the 2014 assaults. *State v. Weathers*, No. A-16-305, 2017 WL 24777 (Neb. App. Jan. 3, 2017) (selected for posting to court website). As will be discussed below, Weathers asserts that the DNA sample collected in connection with the investigation of the 2014 assaults was used to connect him to the 2002 and 2004 assaults that are the subject of the present case.

As part of Weathers' sentencing for the 2014 assaults, pursuant to Neb. Rev. Stat. § 29-4106 (Reissue 2016), the district court ordered Weathers to submit a DNA sample for use in the State DNA Sample Bank. On June 5, 2017, the district court entered an order in response to the State's "Motion to Enforce Order." The court stated that employees of the Department of Correctional Services had twice attempted to obtain a DNA sample from Weathers but that he refused to comply voluntarily.

The court further stated that despite Weathers' refusal, he was still required to submit a DNA sample. The court then cited authority to the effect that it had "'the power to enforce [its decision] by making such orders as are necessary to carry its judgment or decree into effect'" (quoting *Evans v. Frakes*, 293 Neb. 253, 259, 876 N.W.2d 626, 632 (2016)) and that it had "authority to do such things as are reasonably necessary for the proper administration of justice" (citing *State v. Joubert*, 246 Neb. 287, 518 N.W.2d 887 (1994)). Based on such authority and on its finding that the law and its sentencing order required Weathers to submit to the collection of a DNA sample, the court ordered that "employees of the Department of Correctional Services shall forthwith collect a DNA sample from [Weathers] via buccal swab" and that "such employees of the Department are hereby authorized to use such force as is reasonably necessary to obtain or collect a DNA sample from [Weathers]."

Under the authority of the June 5, 2017, order, a DNA sample was collected from Weathers; the DNA sample was then provided to the Nebraska State Patrol DNA identification laboratory and entered into a state DNA database. On June 12, Det. Christy Jaworski received a letter from the DNA database "indicating that . . . Weathers was matched to four outstanding sexual assaults" that had occurred in 2002 and 2004. Based on protocol, that same day, Jaworski obtained a court order to collect four additional DNA samples from Weathers to be tested against the DNA evidence that had been collected in each of the four outstanding cases. After the additional samples were collected and tested, the results showed that Weathers' DNA profile matched that of the assailant in the four sexual assaults from 2002 and 2004. The results of the testing of the DNA samples obtained pursuant to the June 12 order would ultimately be admitted into evidence at the trial in this case.

On August 9, 2017, the State filed an information charging Weathers with four counts of first degree sexual assault related

to the 2002 and 2004 incidents. Prior to trial, Weathers filed a motion to suppress evidence obtained as a result of the DNA samples collected in June 2017. He asserted that the samples were seized and collected from him in violation of his constitutional rights and in violation of statutes governing the collection and use of DNA samples.

At a hearing on the motion to suppress, Jaworski testified regarding her investigation of the present case and how she went about obtaining the DNA samples that were used to tie Weathers to the 2002 and 2004 assaults. The court received into evidence the February 17, 2016, sentencing order related to the 2014 assaults; the June 5, 2017, order authorizing corrections employees to collect a DNA sample using reasonably necessary force; and the June 12, 2017, court order requiring collection of the DNA samples used in this case.

On cross-examination by Weathers at the suppression hearing, Jaworski testified that it was her understanding that in 2014, when Weathers was being investigated for the 2014 assaults and a DNA sample had been collected from Weathers in connection with that investigation and submitted to a laboratory for testing, a laboratory technician "recognized a very rare DNA allele that . . . Weathers has." Jaworski was notified in 2014 that "Weathers was a match to the serial rape case [from 2002 and 2004] because they had been aware of this rare allele." Jaworski further testified on cross-examination that in 2014, she had asked Weathers to give his consent to provide a DNA sample for use in the investigation of the sexual assaults from 2002 and 2004 but he had declined. She testified that in 2014, she did not further pursue a DNA sample related to the earlier assaults, because "the decision was made by the County Attorney's Office to try [the 2014 assaults] case first and separately." She testified, however, that "our department did compare the [un]known suspect DNA in the four outstanding sexual assaults against . . . Weathers' buccal swab [in the 2014 case] and it was — at that time it was a match" and that "that's how we knew he was identified."

On redirect, Jaworski testified that the DNA sample given by Weathers in connection with the investigation in 2014 was not and could not have been entered into the state DNA database. She testified, however, that the presence of the rare allele in the DNA evidence from the earlier sexual assaults had been "widely known" among law enforcement personnel since 2002.

At the end of the suppression hearing, Weathers generally argued that the DNA sample collected in connection with the investigation of the 2014 assaults was improperly compared to the DNA evidence from the 2002 and 2004 assaults, because at that time, there was no probable cause to link Weathers to the 2002 and 2004 assaults. He argued that the comparison to the 2002 and 2004 DNA evidence violated his constitutional rights and that it violated Neb. Rev. Stat. § 29-4126 (Reissue 2016), which he argued prohibited use of a DNA sample without probable cause as to the particular crime being investigated. He argued that the same limitations applied to the DNA samples taken in 2017 and that the DNA evidence collected in 2017 was "fruit of the poisonous tree" because it was obtained as a result of the unconstitutional comparison of the 2014 investigative DNA sample to the DNA evidence in the 2002 and 2004 assaults. He further argued that, independently of what occurred in 2014, the State failed to show that the 2017 DNA samples were collected in compliance with the DNA Identification Information Act, Neb. Rev. Stat. §§ 29-4101 to 29-4115.01 (Reissue 2016 & Cum. Supp. 2018).

The district court overruled Weathers' motion to suppress the DNA evidence. The court first addressed Weathers' arguments regarding the use of the DNA sample collected in 2014 as follows:

Much of [Weathers'] motion and his argument revolves around the DNA collection from the unrelated 2014 investigation for first-degree sexual assault of a child, but there was no evidence adduced during the hearing to support a finding that the 2014 DNA sample was ever submitted

for comparison in this current case. Thus, the Court finds the 2014 DNA collection and investigation irrelevant for purposes of this motion . . . .

The court focused instead on the two collections of DNA samples that occurred in June 2017.

Regarding the DNA sample collected pursuant to the June 5, 2017, order, the court determined that collection of the DNA sample was authorized by § 29-4106 because Weathers was a convicted felon. The court further determined that collection of a DNA sample from a convicted felon pursuant to a statute such as § 29-4106 did not violate the Fourth Amendment. The court noted that the subsequent submission of the DNA sample into the state DNA database was "anticipated under [the] DNA Identification Information Act."

Regarding the DNA samples collected pursuant to the June 12, 2017, order, the court determined that Jaworski's affidavit provided probable cause for the order, based on the notification Jaworski received indicating that submission of the DNA sample obtained based on the June 5 order to the state DNA database showed that Weathers' DNA profile "matched the DNA profile of the previously unknown suspect from four sexual assaults that occurred in 2002-2004." The court determined that because it was supported by probable cause, the June 12 order did not violate the Fourth Amendment, nor did it violate Neb. Rev. Stat. § 29-3303 (Reissue 2016), which requires probable cause for an order to collect identifying physical characteristics, or § 29-4126, which provides that no DNA sample may be obtained in connection with an investigation of a crime without probable cause, a court order, or voluntary consent.

Having concluded that the State had met its burden to establish that the Fourth Amendment had not been violated, the court briefly addressed, and rejected, Weathers' other arguments. The court rejected Weathers' argument that use of the 2014 DNA sample in connection with the 2002 and 2004 assaults was not supported by probable cause. The court

repeated its determination that there was no evidence that the 2014 investigative DNA sample "was ever submitted to be tested against the DNA collected from the 2002-2004 sexual assaults or put into [the state DNA database]." The court stated that, instead, "law enforcement waited to do an investigatory comparison of [Weathers'] DNA to the 2002-2004 sexual assault DNA evidence until [2017, when] there was a match to [Weathers'] DNA collected under the DNA Identification Information Act."

The court next rejected Weathers' argument that collection of the DNA samples in June 2017 violated the DNA Identification Information Act because the act requires that a medical or corrections professional, rather than a law enforcement officer, collect the DNA from a defendant. The court stated that the evidence presented at the suppression hearing showed only that Jaworski did not personally collect the DNA samples and that she did not know specifically who had collected the samples. The court determined that Weathers had not provided evidence to support his claim of a violation of the act, and the court further determined that even if there was a violation, Weathers cited no authority to the effect that such a violation would require suppression of the DNA evidence. Having rejected these and Weathers' other arguments, the court overruled the motion to suppress DNA evidence.

A few days prior to the date trial was scheduled to begin, Weathers filed a pro se motion to dismiss his current counsel and appoint new counsel. He alleged, inter alia, that counsel had proved to be ineffective or incompetent because counsel had missed a pretrial conference and had failed to meet with Weathers prior to trial to discuss the case or to review discovery. He further alleged that counsel, who worked for the public defender's office, had a conflict of interest, because in a postconviction action in a separate criminal proceeding, Weathers was raising ineffective assistance claims involving a different attorney who also worked for the public defender's office. Weathers requested that new counsel be appointed and

that a continuance be granted to allow new counsel to prepare for trial.

The day after Weathers filed the motion, the court held a hearing on it and other motions. The court asked whether Weathers had any reason other than those set forth in his motion why counsel should be dismissed, and Weathers replied that there was not. The court then stated that the reasons set forth by Weathers constituted mere dissatisfaction with counsel, which would not be sufficient to justify removal of counsel absent a showing of good cause. The court found that Weathers had not shown good cause for removal of his counsel, and the court then told Weathers that if it denied his request, Weathers' only options would be to continue with his current counsel or represent himself. Weathers stated that he would stay with his appointed counsel.

At trial, the State presented witnesses, including the four victims of the assaults in 2002 and 2004. The four victims were not able to identify the person who committed the assaults, because he had taken steps to conceal his identity, but each of them gave descriptions of the perpetrator's general appearance and size that were similar to one another and that were similar to Weathers' general appearance and size. The four victims each gave descriptions of how the assaults were carried out, which included details that were similar to the other victims' accounts. The State also presented evidence regarding the testing of the DNA samples that were obtained from Weathers in 2017, which testing showed that Weathers' DNA profile matched that of DNA evidence collected in the investigations of the 2002 and 2004 assaults. Weathers' counsel did not renew the motion to suppress such evidence and did not object to the admission on the bases presented in the motion to suppress or on the basis that a chain of custody was lacking for the DNA evidence collected in the investigation of the assaults.

The jury found Weathers guilty of four counts of first degree sexual assault, and the court accepted the verdicts. The court

thereafter sentenced Weathers to imprisonment for 40 to 50 years for each count and ordered the sentences to be served consecutively.

Weathers appeals his convictions.

## ASSIGNMENTS OF ERROR

Weathers, who has new counsel on appeal, claims that his trial counsel provided ineffective assistance in certain respects. The first few claims of ineffective assistance of counsel relate to the DNA evidence. Weathers claims that counsel provided ineffective assistance of counsel when counsel at trial failed to object to admission of the DNA evidence and renew the motion to suppress on the bases that (1) the comparison of the 2014 DNA sample to the DNA evidence in the 2002 and 2004 assaults violated § 29-4126 and Weathers' constitutional rights and (2) the June 5, 2017, order authorizing corrections employees to obtain a DNA sample from Weathers using force violated his constitutional rights. He further claims that apart from the claims of ineffective assistance of counsel, it was plain error for the court to admit the DNA evidence, because it was obtained as the result of violations of his constitutional rights.

Weathers also claims that counsel provided ineffective assistance by failing to object to the DNA evidence on the basis that the State failed to establish a chain of custody for the DNA evidence collected in the investigations of three of the four assaults.

Weathers further claims that the district court erred when it refused to remove his trial counsel and appoint new counsel on the basis of counsel's alleged ineffective assistance in pretrial proceedings and trial preparation and on the basis of an alleged conflict of interest. Weathers also claims, independently of the claim related to the court's ruling on the motion to remove counsel, that trial counsel provided ineffective assistance of counsel as alleged in the motion—i.e., in failing to attend a pretrial conference, in failing to meet with Weathers prior to

trial to discuss the case or to review discovery, and in representing Weathers despite a conflict of interest.

Finally, Weathers makes two additional claims of ineffective assistance of trial counsel: (1) that counsel failed to move for a continuance of the trial on the bases that counsel had not adequately prepared for trial and that the State had been granted a motion to endorse an additional witness only 3 days prior to the start of the trial and (2) that counsel failed to adequately investigate and present several aspects of his defense.

## STANDARDS OF REVIEW

[1,2] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id*.

[3] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

[4] A trial court's decision to sustain or overrule a defendant's motion to dismiss appointed counsel and appoint substitute counsel is reviewed for an abuse of discretion. See *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). See, also, *State v. McPhail*, 228 Neb. 117, 421 N.W.2d 433 (1988).

## ANALYSIS

*Ineffective Assistance Claims.*

Weathers, who has new counsel on appeal, makes several claims on direct appeal that his trial counsel provided ineffective assistance in various respects. Before specifically addressing those and his other claims, we set forth standards applicable to claims of ineffective assistance of counsel raised on direct appeal.

[5,6] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*. The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*.

[7-11] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Munoz, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id*. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the

outcome. *Id*. The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019).

[12,13] When an ineffective assistance of counsel claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal. *Id.*

[14-17] Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *Id.* An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id*. In the case of an argument presented for the purpose of avoiding procedural bar to a future postconviction proceeding, appellate counsel must present a claim with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018). A claim insufficiently stated is no different from a claim not stated at all. *Id*.

*Failure to Object to DNA Evidence and Renew*
*Motion to Suppress Was Not Ineffective*
*Assistance of Counsel, and It Was Not*
*Plain Error to Admit Such Evidence.*

Weathers' first three assignments of error relate to the admission of the DNA evidence that tied Weathers to the 2002 and 2004 sexual assaults. He claims that trial counsel provided ineffective assistance when counsel failed to preserve challenges to admission of the DNA evidence for appeal by failing to renew his motion to suppress and failing to object to the admission of the evidence at trial. He further claims that in light of the alleged constitutional violations in the collection of the DNA evidence, it was plain error for the district court to admit the evidence. We determine that the DNA evidence was admissible and should not have been suppressed. We therefore conclude that Weathers could not show ineffective assistance of trial counsel in this respect and that the district court did not commit plain error when it admitted the evidence. Weathers' challenges to the admission of the DNA evidence are without merit.

The DNA evidence admitted at trial consisted of the results of the testing of the DNA samples that were collected from Weathers pursuant to the June 12, 2017, order. In its order overruling Weathers' motion to suppress, the district court concluded that the order was supported by probable cause based on the notification investigators received from the state DNA database indicating that Weathers' DNA profile matched the DNA profile of the previously unknown suspect from the four sexual assaults that are the subject of the charges in this case. On appeal, Weathers does not argue that the match of his DNA profile to the DNA profiles in the state DNA database did not provide probable cause to support the June 12 order to collect DNA samples for purposes of investigating the 2002 and 2004 assaults. Instead, he argues that two prior DNA collections violated his constitutional and statutory rights and that therefore the DNA samples

collected pursuant to the June 12, 2017, order were "fruit of the poisonous tree."

Weathers argues that the DNA evidence should have been suppressed because (1) the comparison of the 2014 DNA sample to the DNA evidence in the 2002 and 2004 assaults violated § 29-4126 and Weathers' constitutional rights and (2) the June 5, 2017, order authorizing corrections employees to obtain a DNA sample from Weathers using force violated his constitutional rights. As discussed below, we determine that the June 12 order was not dependent on the 2014 DNA sample and that therefore even if the collection or use of the 2014 DNA sample were improper, evidence obtained pursuant to the June 12 order did not need to be suppressed. We further determine that while the June 12 order was dependent on the DNA sample collected pursuant to the June 5 order, the collection of Weathers' DNA sample under the authority of the June 5 order did not violate Weathers' Fourth Amendment rights.

Regarding the 2014 DNA sample, Weathers argues that the collection of the sample was in violation of his Fourth Amendment rights, because in the present case, the State did not provide "evidence that police had a court order allowing police to take Weathers' DNA in 2014, nor did the State introduce evidence that an exception to the warrant requirement applied." Brief for appellant at 24. Weathers further argues that once the DNA sample had been collected, it was improper to compare the DNA sample collected in connection with the 2014 assaults to the DNA evidence in the unsolved cases from 2002 and 2004. He argues that such comparison violated his Fourth Amendment rights and that it also violated § 29-4126. Weathers argues that § 29-4126(1) requires "probable cause, a court order, or voluntary consent" related to the investigation of a particular crime and that even if the collection of the DNA sample in 2014 was justified as to the investigation of the 2014 assaults, investigators did not have probable cause, a court order, or Weathers' consent to collect or use the DNA sample for the investigation of the 2002 and 2004 assaults. He

argues that "police simply chose to violate the law by comparing Weathers' 2014 sample, taken as part of an unrelated investigation, to the unknown suspect sample from the 2002-2004 sexual assaults." Brief for appellant at 23.

In its order overruling the motion to suppress, with regard to the 2014 DNA sample, the district court found that "there was no evidence adduced during the hearing to support a finding that the 2014 DNA sample was ever submitted for comparison in this current case." The district court determined that the 2014 DNA sample was "irrelevant" to the motion to suppress and overruled the motion. The State in its brief on appeal acknowledges that there was evidence in the record that "there was some sort of comparison of Weathers' DNA sample in 2014, though the extent of that comparison is unclear." Brief for appellee at 16. The State takes the position that even if the DNA sample collected in connection with the 2014 assaults was compared to the DNA evidence in the unsolved cases from 2002 and 2004, it does not follow that the State violated either the Fourth Amendment or § 29-4126. The State contends that once the DNA sample from the 2014 assaults was lawfully in its possession, neither the Fourth Amendment nor § 29-4126 restricted its use of that sample.

The evidence of a comparison included Jaworski's testimony at the suppression hearing that "our department did compare the [un]known suspect DNA in the four outstanding sexual assaults against . . . Weathers' buccal swab [in the 2014 case] and it was — at that time it was a match" and that "that's how we knew he was identified." However, Jaworski did not testify that she had personally made such a comparison and she could not testify as to exactly what sort of comparison was made in 2014 to the evidence from the 2002 and 2004 cases.

Instead, during the trial, Weathers made an offer of proof of testimony by Kaye Shepard, a laboratory DNA analyst who in 2014 had analyzed Weathers' DNA sample in connection with the investigation of the 2014 assaults. Shepard testified that she noted Weathers' DNA contained "a very rare allele that

we hadn't seen for many, many years in the laboratory" and that she remembered seeing the rare allele in a sample she had analyzed in 2004. Shepard denied that the 2014 DNA sample was put into a DNA system for a comparison, and she resisted testifying that she compared Weathers' entire DNA profile to a suspect DNA profile, testifying instead that "I remember just the [rare allele] standing out." Shepard further acknowledged that in 2014, she "may have called somebody at the Omaha Police Department to tell them that we had" a DNA sample with the rare allele, "which they know about from previous years."

Jaworski testified that after being informed in 2014 by the laboratory that "Weathers was a match to the serial rape case because they had been aware of this rare allele," she had asked Weathers to give his consent to provide a DNA sample in connection with the earlier serial rapes, but that after he declined his consent, she did not further pursue a DNA sample related to the earlier assaults, because "the decision was made by the County Attorney's Office to try [the 2014 assaults] case first and separately." Jaworski further testified that the DNA sample given by Weathers in 2014 was not and could not have been entered into the state DNA database and that the presence of the rare allele in the DNA evidence from the earlier sexual assaults had been "widely known" among law enforcement personnel since 2002.

Therefore, the evidence in this case does not indicate a "comparison" of the 2014 DNA sample to the evidence from the 2002 and 2004 assaults, at least in the sense of a comparison of Weathers' full DNA profile or the entry of his DNA profile into a database. Instead, it indicates that a laboratory technician noted the presence of a rare allele which might tie Weathers to the earlier cases and that she had reported her observation to investigators. Jaworski sought Weathers' consent to give a DNA sample to use in the investigation of the earlier cases. However, after he refused consent, she did not further pursue obtaining a DNA sample or obtaining evidence

to tie Weathers to the prior assaults. Instead, it appears that investigators determined, after consultation with the county attorney, that the possible connection of Weathers to those prior assaults would not be pursued at that time and that instead they would wait to see whether Weathers was convicted of the 2014 assaults. Therefore, it appears the State made a strategic decision to wait and see whether Weathers would become a convicted felon, at which time his DNA would be collected and put into the state DNA database pursuant to the DNA Identification Information Act.

Even if we were to assume that Shepard's observation of the rare allele constituted a "comparison" of the 2014 DNA sample to the evidence in the 2002 and 2004 cases and even if we were to assume this comparison violated the Fourth Amendment or § 29-4126, we agree with the district court's determination that the collection and use of the 2014 DNA sample are not relevant to the suppression issues in this case. The record indicates that the DNA sample collected from Weathers in the 2014 investigation did not directly lead to the DNA evidence that was offered and admitted at his trial in the present case involving the 2002 and 2004 assaults. Instead, the evidence admitted in this case directly resulted from the DNA samples collected pursuant to the June 12, 2017, order, which in turn was supported by probable cause based on evidence generated by the collection of the DNA sample pursuant to the June 5, 2017, order. As we discuss below, the collection of the DNA sample pursuant to the June 5 order was properly based on the authority of § 29-4106 and Weathers' status as a convicted felon. Evidence generated from the DNA sample collected in 2014 was not directly used to support either of the collections of DNA samples in 2017. Therefore, even if the collection and the subsequent use of the DNA sample in 2014 were improper, the DNA evidence admitted in this case was collected in 2017 and was not dependent on the 2014 DNA sample, and therefore the DNA evidence at issue in the current appeal would not have been suppressed based on any error that occurred in 2014.

We therefore reject Weathers' argument that trial counsel was ineffective for failing to preserve a challenge to admission of the DNA evidence based on alleged errors in the collection or use of the 2014 DNA sample.

As noted above, the DNA evidence admitted in this case was the product of the DNA samples collected pursuant to the June 12, 2017, order and the probable cause which supported that order was based on evidence that resulted from the DNA sample collected pursuant to the June 5, 2017, order. Therefore, error in the collection of the DNA sample pursuant to the June 5 order could have required suppression of the DNA evidence in this case. However, we determine that the June 5 collection was proper based on § 29-4106.

Weathers argues that the district court did not have authority to issue the June 5, 2017, order and that therefore, the collection of a DNA sample pursuant to that order violated his Fourth Amendment rights. However, even if the district court had not issued the June 5 order, the State was authorized by § 29-4106 to collect the DNA sample and to use reasonable force to do so.

Section 29-4106 provides, in relevant part, as follows:

(1) A person who is convicted of a felony offense or other specified offense on or after July 15, 2010, who does not have a DNA sample available for use in the State DNA Sample Bank, shall, at his or her own expense, have a DNA sample collected:

(a) Upon intake to a prison, jail, or other detention facility or institution to which such person is sentenced. If the person is already confined at the time of sentencing, the person shall have a DNA sample collected immediately after the sentencing. Such DNA sample shall be collected at the place of incarceration or confinement. Such person shall not be released unless and until a DNA sample has been collected[.]

There is no dispute that Weathers was convicted of a felony offense in connection with the 2014 assaults. Therefore, under

§ 29-4106, Weathers was required to have a DNA sample collected for use in the State DNA Sample Bank.

Weathers argues, however, that he could not have been forced to supply a DNA sample on June 5, 2017. He notes the last sentence of § 29-4106(1)(a), which provides that a convicted felon "shall not be released unless and until a DNA sample has been collected," and he argues that this sentence provides the exclusive mechanism authorized to enforce the requirement for a convicted felon to provide a DNA sample. That is, the only way a convicted felon may be forced to provide a sample is at the completion of his or her sentence, at which time the State may coerce him or her to provide a sample by refusing to release him or her until the sample is provided. However, we do no read this sentence as providing an exclusive mechanism for enforcement or as prohibiting the State from using other means to obtain the DNA sample that a convicted felon is statutorily required to provide.

[18] We note in this regard that § 29-4106(1)(a) provides that the requirement for a convicted felon to provide a DNA sample becomes effective "[u]pon intake to a prison, jail, or other detention facility or institution to which such person is sentenced," or "[i]f the person is already confined at the time of sentencing, the person shall have a DNA sample collected immediately after the sentencing." The requirement therefore exists once the convicted felon begins serving his or her sentence. Although the convicted felon may not be released at the end of the sentence unless or until he or she has provided the DNA sample, the convicted felon's obligation to provide a DNA sample exists, and may be enforced, at the beginning of the sentence.

On June 5, 2017, Weathers had been sentenced for the 2014 felonies and was confined pursuant to such sentences. Therefore, on that day, he was legally required under § 29-4106(1)(a) to have a DNA sample collected. Even without the June 5 order, the State was authorized by § 29-4106(1)(a) to enforce the requirement that Weathers provide a DNA sample. Weathers

disagrees and instead contends that the collection of the DNA sample was an unreasonable seizure that violated his Fourth Amendment rights.

Courts have generally held that statutes such as § 29-4106 that require a convicted felon to provide a DNA sample for inclusion in a DNA database do not violate Fourth Amendment protections against unreasonable seizure. See *U.S. v. Kraklio*, 451 F.3d 922 (8th Cir. 2006), and cases cited therein. See, also, *Maryland v. King*, 569 U.S. 435, 481, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (2013) (collection of DNA sample pursuant to statute authorizing such collection from arrestee does not violate Fourth Amendment; in his dissent, Justice Scalia notes that "[a]ll parties concede that it would have been entirely permissible, as far as the Fourth Amendment is concerned, for [the plaintiff] to take a sample of [the defendant's] DNA as a consequence of his conviction for second-degree assault"). Therefore, to the extent Weathers might have challenged the collection of his DNA on June 5, 2017, on the basis that § 29-4106 violated the Fourth Amendment by authorizing collection of his DNA, such challenge would not have been successful and counsel was not ineffective for failing to preserve the challenge.

However, Weathers further argues that it was a Fourth Amendment violation for the district court to authorize the use of reasonable force to collect the DNA sample from him. We determine that § 29-4106 inherently authorizes the use of reasonable force to obtain a DNA sample. Other courts have reached a similar result.

In *State v. Banks*, 321 Conn. 821, 839, 146 A.3d 1, 10 (2016), the Connecticut Supreme Court affirmed a lower court's ruling interpreting a statute requiring that DNA samples be collected from all persons convicted of a felony and determining that the "ability to use reasonable force to obtain a DNA sample is implicit in the statute as its fundamental purpose would be subverted otherwise." The Connecticut Supreme Court agreed that "the use of reasonable force to obtain a DNA sample from

an unwilling individual was 'inherent' in" the statute and reasoned that "[t]o conclude otherwise would result in absolute frustration of the legislature's objective in establishing and maintaining a DNA data bank." *Id.* at 842, 146 A.3d at 12. See, also, *Rendelman v. Scott*, 378 Fed. Appx. 309, 313 (4th Cir. 2010) ("State's right to obtain [a] DNA sample from designated inmates must necessarily carry with it the right to use a reasonable degree of force that is sufficient to ensure compliance. Otherwise, the State's right can be rendered meaningless by an inmate who refuses to grant permission . . . ").

[19] We conclude that § 29-4106 inherently authorizes the use of reasonable force to collect a DNA sample from a convicted felon. We further conclude that use of reasonable force does not violate the Fourth Amendment. Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The ultimate touchstone is one of reasonableness. *Id*. We believe that the Fourth Amendment would not prohibit use of reasonable force to carry out an otherwise proper statutorily authorized seizure.

In the June 5, 2017, order, the district court specified that "reasonable" force could be used to obtain the DNA sample, and there is no indication in the record on direct appeal that anything more than reasonable force was used to collect the DNA sample; and, at least in connection with this claim, Weathers does not assert that unreasonable force was used. We note that in connection with his claim, discussed below, that trial counsel failed to adequately investigate and present several aspects of his defense, one of the specific failures Weathers asserts relates to evidence the State allegedly turned over during the trial, "including video of the forcible extraction of Weathers' DNA sample." Brief for appellant at 48. That alleged evidence is not in the record on appeal, and Weathers does not argue in connection with the present claim of ineffective assistance of counsel that counsel should have objected

to admission of the DNA evidence on the basis that excessive force was actually used to obtain the DNA sample on June 5. Instead, his argument is that the court could not authorize reasonable force, and we conclude that § 29-4106 authorizes reasonable force and that such authorization does not violate the Fourth Amendment.

In sum, we conclude that the record on appeal refutes Weathers' first two claims of ineffective assistance of trial counsel. Weathers could not show prejudice from counsel's failure to object to admission of the DNA evidence and to renew the motion to suppress, because the challenges asserted by Weathers related to the 2014 DNA sample and the June 5, 2017, DNA sample collected pursuant to the court's order would not have been successful. In addition, because the record refutes Weathers' claims that DNA evidence should have been excluded based on alleged Fourth Amendment violations, we further conclude that it was not plain error for the court to admit the evidence, and we reject Weathers' assignment of error to that effect.

*Failure to Object to DNA Evidence Based*
*on Chain of Custody Was Not*
*Ineffective Assistance.*

Weathers next claims that trial counsel provided ineffective assistance by failing to object to the DNA evidence on the basis that the State failed to establish a chain of custody for the DNA evidence collected in the investigations of three of the four assaults. We determine the record shows that this claim is without merit.

Weathers' arguments in this claim focus on three of the four victims in this case. Regarding one victim, he asserts that there was "no testimony in the record from the individual who purportedly swabbed [the victim] during the rape kit examination." Brief for appellant at 35. Regarding the second victim, Weathers asserts that the State's witness was a doctor who "could only say that he 'supervised' [the victim's] treatment,

but he did not personally perform or witness these tasks" and testified only that he assumed the samples taken from the victim were properly taken and sealed. *Id.* at 36. Regarding the third victim, Weathers similarly argues that the witness was a doctor who had testified regarding the examination he had given and testified regarding tasks performed by a nurse with respect to the collection, packaging, and sealing of the rape kit.

[20-23] In a case involving a foundational challenge regarding hair specimens submitted for testing and the admission of the results of the testing, we stated the following standards. Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence. *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011). Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue. *Id*. It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading. *Id*. Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object. *Id*. Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis. *Id*.

With regard to the first victim, the State notes that there was testimony by the nurse who participated in the examination of the victim and the collection of swabs and who testified that she had put the collected evidence into sealed envelopes and provided them to police. We agree with the State that this testimony belies Weathers' assertion that there was no testimony by the person who collected the swab used to collect the DNA sample.

Regarding the second and third victims, the State argues that the testimony of the physicians was sufficient to establish proper collection and handling of the samples even if the physicians did not perform all the steps personally. Each of the physicians testified regarding examinations they performed of the respective victims and the procedures performed by themselves and by nurses under their supervision to collect samples. We determine the doctors' testimony regarding their examination of the specific victims and the procedures which were followed in such examinations, when combined with other evidence including the testimony of police officers who collected packaged and sealed kits, was sufficient to establish the chain of custody. Weathers does not cite authority requiring that the specific person who physically collected and sealed the samples must testify, and we think testimony by the doctor who supervised the examination was sufficient to provide that step in the chain.

We do not think a challenge to the admission of the DNA evidence based on chain of custody would have been successful, and therefore the record refutes that there was prejudice from counsel's failure to object on such basis. We therefore conclude that this claim of ineffective assistance of counsel is without merit.

*District Court Did Not Err When It Overruled*
*Motion to Dismiss Counsel, and Counsel*
*Did Not Provide Ineffective Assistance*
*as Alleged in the Motion.*

Weathers next claims that the district court abused its discretion when it overruled his motion to dismiss his counsel and appoint substitute counsel. He further claims that the reasons he set forth in his motion to dismiss counsel also constitute reasons that counsel provided ineffective assistance. We conclude that the court did not abuse its discretion when it refused to appoint substitute counsel and that the record refutes Weathers' claim of ineffective assistance of counsel.

[24-27] When a defendant becomes dissatisfied with court-appointed counsel, unless he or she can show good cause to the court for the removal of counsel, his or her only alternative is to proceed pro se if he or she is competent to do so. *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017). An indigent defendant's right to have counsel does not give the defendant the right to choose his or her own counsel. *State v. Wabashaw*, 274 Neb. 394, 740 N.W.2d 583 (2007). Mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel. *Id*. Appointed counsel must remain with an indigent accused unless one of the following conditions is met: (1) The accused knowingly, voluntarily, and intelligently waives the right to counsel and chooses to proceed pro se; (2) appointed counsel is incompetent, in which case new counsel is to be appointed; or (3) the accused chooses to retain private counsel. *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

In this case, the court gave Weathers the option to proceed pro se, and he rejected that option. Weathers also did not choose to retain private counsel and instead sought appointment of substitute counsel. Therefore, under *State v. McGuire, supra*, in order to remove his counsel and obtain new appointed counsel, Weathers was required to establish not merely that he distrusted or was dissatisfied with his counsel but that trial counsel was incompetent.

[28] As a general matter, Weathers argues that the district court erred because it did not hold an evidentiary hearing on his motion to dismiss his counsel. We have said that once a defendant requesting substitute counsel has raised a seemingly substantial complaint about counsel, the court has a duty to thoroughly inquire into the complaint. *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003). However, we have determined that when a defendant's asserted grounds for discharging counsel and appointing new counsel were insufficient, there was no reason for the court to conduct an evidentiary hearing. See *State v. Wabashaw, supra*. In this case, Weathers'

motion fully set forth his reasons for removing his counsel, and when the court took up the motion, it asked Weathers whether he had any reasons other than those set forth in his motion why counsel should be dismissed and Weathers replied that there were none. The court therefore had enough information from which to determine whether Weathers' assertions had merit, and, as we discuss below, the court in its discretion determined that Weathers' asserted reasons did not require removal of counsel and appointment of substitute counsel. Therefore, the court's failure to hold an evidentiary hearing was not in itself error.

Weathers argues on appeal that the "[m]ost pressing" reasons to dismiss counsel were that (1) counsel, who worked for the public defender's office, had a conflict of interest, because in a prior case, Weathers' counsel was a different attorney from the same office and Weathers, in a postconviction action, was currently challenging the effectiveness of that counsel's assistance in the prior case; (2) counsel had missed a pretrial conference; and (3) counsel had failed to meet with Weathers prior to trial to discuss the case or to review discovery. Brief for appellant at 37.

Regarding Weathers' assertion that counsel had a conflict of interest, we have held that appointed counsel may be removed because of a potential conflict of interest and that such a conflict could, in effect, render a defendant's counsel incompetent to represent the defendant and warrant appointment of new counsel. *State v. McGuire, supra*. The conflict alleged by Weathers was that in a postconviction action, he was alleging that another public defender had provided ineffective assistance in a separate criminal proceeding. Weathers argues that this created an actual conflict of interest with the other public defender and that such conflict should be imputed to his counsel, who was also a public defender. Weathers cites cases to the effect that if one attorney in a firm has an actual conflict of interest, the conflict is imputed to all attorneys in the firm.

However, in a case involving an assertion that an alleged conflict of interest for one attorney in a county attorney's office should be imputed to the other prosecutors in the office, we noted that rules regarding imputed conflicts of interest differ between attorneys employed by law firms and those employed by government agencies. In *State v. Kinkennon*, 275 Neb. 570, 577, 747 N.W.2d 437, 444 (2008), we described a "more flexible rule" provided in Neb. Ct. R. of Prof. Cond. 1.11(d) (rev. 2005) (now Neb. Ct. R. of Prof. Cond. § 3-501.11(d)), which addresses conflicts of interest for current government officers and employees. We noted:

> The official comment 2 to rule 1.11 explains that "[b]ecause of the special problems raised by imputation within a government agency, paragraph (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers." This rule recognizes the distinction between lawyers engaged in the private practice of law, who have common financial interests, and lawyers in a prosecutor's office, who have a public duty to seek justice, not profits.

*State v. Kinkennon*, 275 Neb. at 577, 747 N.W.2d at 444. We think this reasoning applies as well to lawyers within a public defender's office, who also have a public duty to seek justice for the defendants they represent. As to whether Weathers' assertion of claims of ineffective assistance of counsel create a conflict of interest for the specific public defender who represented him in the underlying prior conviction, any such conflict would not be imputed to a different public defender who was representing him in the current proceeding. The district court therefore did not abuse its discretion when it refused to remove Weathers' counsel on the basis of the alleged conflict of interest.

Weathers also argues that counsel deprived him of his right to effective representation and therefore should have been

removed, because counsel missed a "pretrial conference" on January 10, 2018. The record indicates that counsel attended a "pretrial conference" that was held on November 28, 2017. At that conference, the court mentioned that time had been scheduled on January 10, 2018, to consider "pretrial motions." There is no transcript in the record on appeal for a proceeding held on January 10, but at a proceeding held on March 5, Weathers' counsel acknowledges missing a hearing on January 10 due to a misunderstanding that a hearing would not be held that day, because counsel did not have motions ready to be heard that day. The March 5 hearing then continued with, inter alia, defense counsel presenting certain motions. Although counsel missed the scheduled hearing on January 10, there is nothing in the record indicating that anything occurred at that hearing that materially affected Weathers' defense, and it appears that counsel presented motions at a later date. We do not think the record shows that counsel was incompetent in this respect, and therefore we do not think the court abused its discretion when it refused to remove counsel on this basis.

Weathers further argues counsel should have been removed for failing to meet with him prior to trial to discuss the case or to review discovery. The State notes that the record indicates that counsel had met with Weathers to discuss discovery, and Weathers in his motion acknowledged that counsel had met with him, although he alleged counsel did not provide him with "full discovery," which he asserted consisted of "3000 plus pages of discovery." The record also indicates that counsel had made motions to continue the trial in order to allow additional time to prepare with Weathers. These indicate that counsel was engaged in preparation with Weathers, and we do not think it shows that counsel was incompetent. We therefore do not think the court abused its discretion when it refused to remove counsel on this basis.

In addition to arguing that the three above-stated reasons required the court to remove counsel, Weathers also claims on direct appeal that each of the three reasons constituted

ineffective assistance of trial counsel. As discussed above, counsel did not have a conflict of interest based on Weathers' postconviction claims regarding a different public defender; because counsel had no such conflict of interest, it was not deficient performance for counsel to represent Weathers in this proceeding. With regard to the other two reasons, as discussed above, the record on direct appeal does not indicate that counsel was incompetent for either of the asserted reasons. We therefore conclude that on direct appeal, there is no merit to Weathers' claim that trial counsel provided ineffective assistance for the reasons set forth in his motion to remove counsel.

We note, however, that in his final claim of ineffective assistance, which we discuss below, Weathers asserts various claims that he argues cannot be reviewed on direct appeal but that he sets forth to preserve for postconviction review. In that claim, he sets forth various examples of how counsel could have better prepared for trial. Among his specific claims are that counsel was ineffective because counsel failed to investigate what occurred during the January 10, 2018, hearing counsel failed to attend and that if counsel had met with him to discuss discovery, he could have provided leads regarding defenses, including alibi defenses. Our conclusion herein that the record on direct appeal refutes the claim that counsel was ineffective in the ways alleged in the motion to remove counsel does not necessarily foreclose claims related to counsel's performance with respect to the January 10 hearing or to counsel's preparation of Weathers' defense to the extent such claims can be established based on information outside the record in this direct appeal.

*Counsel Was Not Ineffective for Failing*
*to Move for Continuance.*

Weathers claims ineffective assistance of counsel when counsel failed to move for a continuance of the trial a few days before trial was scheduled to begin. Weathers asserts two

reasons counsel should have moved for a continuance: (1) Counsel had not adequately prepared with Weathers for trial, and (2) the court granted the State's motion to endorse a witness 3 days before trial was scheduled to start. We conclude the record on direct appeal refutes this claim.

First, Weathers argues that counsel should have moved for a continuance because counsel had not adequately prepared with Weathers for trial. Weathers' argument in this respect simply refers back to his argument to support his claim that the district court should have sustained his motion to remove counsel on the basis that counsel had failed to meet with him prior to trial to discuss the case or to review discovery. As discussed above, we determine that the record refutes Weathers' claim that the district court should have removed counsel for this reason. For the same reason, we conclude that the record refutes that counsel was ineffective for failing to move for a continuance on the basis of counsel's failure to adequately prepare with Weathers. In particular, we note that the record indicates that counsel made motions for continuance that were denied by the district court. In this respect, we also note that in Weathers' final claim of ineffective assistance of counsel on direct appeal, he asserts that he could have provided counsel leads to investigate defenses, including alibi defenses; such alleged information is obviously not in the record on direct appeal, and we consider below whether this aspect of the claim is refuted in the record.

Weathers further argues counsel was ineffective for failing to move for a continuance based on the court's endorsement of a State's witness a few days before trial was scheduled to begin. As discussed below, we determine that the record shows that Weathers could not show prejudice from counsel's failure to move to continue based on endorsement of the witness.

The record on direct appeal shows that on March 22, 2018, the State filed a motion for leave to endorse John Cress as a witness, and that on March 23, Weathers' counsel filed an

objection to the motion, noting that trial was set to begin on March 26. Weathers' counsel asserted that the motion should be denied because the State's request was filed after deadlines had passed for endorsing witnesses and for filing motions. The court heard the State's motion and Weathers' objection on March 23. The transcript of the hearing showed that Cress would testify regarding chain of custody for the DNA evidence, specifically "transporting evidence to the State crime lab." After hearing argument on the motion and Weathers' objection, which included discussion regarding prejudice to the preparation of the defense, the court sustained the State's motion to endorse the witness but "require[d] that the State make [Cress] available for a deposition for [Weathers] before he testifies." At trial, Cress testified as the last witness on March 27. He generally testified that he was an Omaha police officer and that on October 4, 2002, he was assigned to "pick up a rape kit at central station property room and transport it to the Nebraska State Patrol Crime Lab." He testified further regarding completing this assignment. Cress' testimony was relatively brief, and Weathers' counsel took the opportunity to cross-examine and re-cross-examine Cress regarding his testimony.

We conclude that Weathers could not show prejudice resulting from counsel's failure to move for a continuance based on the endorsement of the witness shortly before trial. We note that if counsel had moved for a continuance, the decision would have been left to the district court's discretion. See *State v. Baxter*, 295 Neb. 496, 888 N.W.2d 726 (2017) (stating that decision whether to grant continuance in criminal case is within discretion of trial court and will not be disturbed on appeal absent abuse of discretion). Also, we have said that a trial court, in the exercise of its discretion, may permit additional witnesses to be endorsed within the 30 days before trial and even after the trial has begun, provided doing so does not prejudice the rights of the defendant. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). In this case, at the hearing on the State's motion to endorse Cress as a witness, the court took

into consideration whether doing so a few days prior to trial would prejudice Weathers in the preparation of his defense. The court addressed any potential prejudice by requiring the State to make Cress available to Weathers for a deposition before he testified.

Considering the nature of Cress' testimony, basically establishing a link in the chain of custody, we do not think the court abused its discretion when it sustained the State's motion to endorse. Furthermore, the court addressed potential prejudice by requiring that Cress be made available for a deposition. Although it is not clear from the record whether Weathers took Cress' deposition, the record does show that Weathers thoroughly cross-examined Cress on the matters to which he testified and that Weathers re-cross-examined Cress after the State's redirect.

We note further that requiring Cress to be made available for a deposition adequately addressed the concerns that would have been considered if Weathers' counsel had moved for a continuance. Therefore, if counsel had moved for a continuance, the court likely would have denied a continuance and instead ordered the same remedy it gave in response to Weathers' objection to endorsement of the witness, and we do not think it would have been an abuse of discretion to deny such a motion to continue. Weathers cites *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013), in which we held that the trial court abused its discretion when it denied the defendant's request to continue trial based on a codefendant's plea agreement with the State, executed on the eve of trial, pursuant to which she agreed to testify against the defendant. By contrast to the testimony of a codefendant, Cress' testimony in this case was limited in scope and relatively minor given the entirety of the evidence in the case. Making Cress available for a deposition without granting a continuance of the trial was sufficient to protect against prejudice to Weathers' preparation of his defense. Therefore, the record refutes this claim of ineffective assistance of counsel.

*Weathers' Claims of Failures by Counsel*
*Relating to Investigation and Presentation*
*of Defenses Are Either Refuted by the*
*Record or Cannot Be Reviewed*
*on Direct Appeal.*

Weathers finally claims that counsel failed to adequately investigate and present several aspects of his defense. Weathers asserts that the record on direct appeal is not sufficient to review these claims but that he is setting them forth herein in order to preserve the claims for postconviction review. In each of these claims, Weathers asserts that counsel failed to discover or to pursue certain information that could have helped his defense. These claims therefore rely on evidence or information that is not included in the record on appeal, and we therefore agree with Weathers that the claims could not be resolved on direct appeal. However, we determine that two of the claims, which both relate to the alleged use of the 2014 DNA sample, are shown to be without merit because, as we discussed above, the DNA evidence admitted at trial was not dependent on the 2014 DNA sample.

In the argument section of his brief, Weathers sets forth the following claims:

- Trial counsel failed to consult with or call as a witness an expert in the field of DNA identification. A DNA identification expert would have evaluated all the testing done in this case, including the testing of other suspects' profiles done by investigators, and testified that another suspect, possibly an unknown relative of Weathers, matched the unknown suspect's profile, and that the lab technicians called by the State made mistakes in the testing and interpretation of DNA in this case.

- In relation to the ineffective assistance directly above, trial counsel failed to investigate or subpoena DNA analyst "Christine." This analyst would have testified that investigators were told the person who committed the sexual assaults could be a relative of Weathers because

they shared most of the DNA core loci, yet police did not use this information to further investigate other individuals who may have committed the sexual assaults.

• Trial counsel failed to investigate the circumstances of the 2014 case against Weathers. Had he done so, he would have discovered additional testimony by . . . Jaworski confirming not only that an investigative comparison was illegally done between Weathers' 2014 DNA sample and that of the unknown suspect, but that investigators did upload Weathers' DNA profile to CODIS. The trial court found no evidence that either an investigatory comparison or a CODIS search occurred in 2014. . . .

• Trial counsel similarly failed to investigate or call former crime lab director James Wisecarver regarding crime lab policies and procedures, which would have provided evidence in addition to that provided by . . . Jaworski that investigators both conducted an investigative comparison of Weathers' 2014 DNA sample to the unknown suspects in 2014.

• Trial counsel failed to request a continuance or mistrial when, during trial, the State turned over evidence including video of the forcible extraction of Weathers' DNA sample, evidence relevant not only to the motion to suppress the DNA evidence, but to . . . Weathers' defense that the State and the trial court targeted Weathers for malicious prosecution.

• Trial counsel failed to investigate *ex parte* communications that occurred between the trial court and the prosecutor that occurred during the January 10, 2018 pretrial conference missed by trial counsel. . . . These communications would have provided additional evidence relevant to Weathers' defense that the State and the trial court targeted Weathers for malicious prosecution, and would have supported a motion to recuse both the prosecutors and trial court prior to trial.

> • Trial counsel failed to engage in meaningful discussions
> of the case with Weathers prior to trial. Had he done
> so and allowed Weathers to review all the discovery,
> Weathers would have had an opportunity to provide
> trial counsel with leads for possible defenses, includ-
> ing potential alibi defenses. Trial counsel was therefore
> ineffective in failing to further investigate these poten-
> tial defenses.

Brief for appellant at 47-49.

The third and fourth claims above both relate to allegations
that counsel failed to pursue evidence that could have shown
that investigators in 2014 had made a comparison of the DNA
evidence from the 2002 and 2004 unsolved cases to the DNA
sample Weathers provided in connection with the investiga-
tion of the 2014 assaults. However, as we discussed above, the
DNA evidence that was admitted at the trial in this case was the
result of DNA samples that were collected in 2017, and such
evidence was obtained independently of the collection or use
of Weathers' DNA sample in 2014. Therefore, even if Weathers
were able to show some impropriety in the collection or use of
the 2014 DNA sample, it would not have required suppression
of the DNA evidence that was admitted in the present case. We
therefore conclude that the record on direct appeal refutes the
third and fourth claims above.

Regarding the remaining claims above, each of the claims
relies on alleged evidence or information that is not included
in the record on direct appeal, and none of these claims are
clearly refuted by anything in the record. Therefore, we can-
not say on direct appeal that these claims are without merit.
We agree with Weathers' assertion that these claims cannot
be determined on direct appeal, because the record on appeal
does not disclose what steps trial counsel took in regard to
these avenues of investigation, what would have been found
if the various actions had been taken by counsel, and whether
the findings would have helped Weathers' defense. Weathers'
brief on appeal did not specifically assign these claims as error,

as required by our recent decision in *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019), but his brief was filed prior to the release of our *Mrza* decision. Therefore, we include this listing so that a district court reviewing any petition for postconviction relief that Weathers might bring in the future will be able to recognize what specific claims were brought before this court on direct appeal.

[29,30] As we recently emphasized in *State v. Stelly, ante* p. 33, 932 N.W.2d. 857 (2019), when an appellate court finds, on direct appeal, that the record is not sufficient to resolve a claim of ineffective assistance, it should not be misunderstood as a finding that the claim will necessarily require an evidentiary hearing if raised in a motion for postconviction relief, because that determination is governed by an entirely different standard. Also, just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim. *Id*.

## CONCLUSION

Regarding Weathers' assignments of error by the district court, we conclude that the court did not commit plain error when it admitted the DNA evidence in this case and that it did not abuse its discretion when it overruled Weathers' motion to remove counsel and appoint substitute counsel. Regarding Weathers' claims of ineffective assistance of trial counsel, we determine, as set forth above as to each specific claim, either that the record on direct appeal shows the claim is without merit or that the record on direct appeal is not sufficient to review the claim. We therefore affirm Weathers' convictions and sentences for four counts of first degree sexual assault.

Affirmed.

Freudenberg, J., not participating.