IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. REYES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TIMOTHY L. REYES, APPELLANT.

Filed April 21, 2020.    No. A-19-394.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

Joseph P. Naatz, of Kreikemeier Law, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial in the Douglas County District Court, Timothy L. Reyes was found guilty and convicted of first degree sexual assault of a child and third degree sexual assault of a child. Reyes appeals his convictions, challenging the competency of the child witness and the sufficiency of the evidence. He also contends that his trial counsel was ineffective. We affirm Reyes' convictions; however, we have noted an issue of plain error in his sentence. Accordingly, we affirm in part, and in part vacate and remand for resentencing on one of the sentences imposed.

1

## II. BACKGROUND

### 1. Pretrial Proceedings

On June 7, 2018, the State filed an information charging Reyes with one count of first degree sexual assault of a child, a Class IB felony, pursuant to Neb. Rev. Stat. § 28-319.01 (Reissue 2016), and one count of third degree sexual assault of a child, a Class IIIA felony, pursuant to Neb. Rev. Stat. § 28-320.01 (Reissue 2016). The named victim was M.B., and the offenses were alleged to have occurred between January 1 and May 4, 2017. The information was later amended to reflect that the charged offenses were alleged to have occurred between August 1, 2016, and April 5, 2017 (when M.B. would have been 2 to 3 years old).

On November 7, 2018, Reyes filed a motion to exclude M.B. as a witness, alleging that she was not competent to be a witness at trial. At an evidentiary hearing on November 15, the district court received into evidence a video recording of M.B.'s April 2018 forensic interview and a copy of M.B.'s October deposition.

We have reviewed the video recording of the April 2018 forensic interview wherein M.B. was able to state her age (4 years old), why she was being interviewed (the reason was unrelated to Reyes or the charged offenses), and who she lived with. During the interview, M.B. disclosed that "Tim" touched her "butt" and her "kooka" (she pointed to her genital region when asked what her kooka was). M.B. stated that Tim "licked" her kooka one time and that "it tickled." She also stated that Tim touched her kooka with his "hand slobber" at her birthday. M.B. said that Tim licked her butt. Upon further inquiry, M.B. stated that Tim took her clothes off, gave her toys to play with, and then he played with her butt and mouth. M.B. told the interviewer that she had touched Tim's kooka with her hand (it felt like "pee") and that she had licked his butt and kooka. She said that Tim was a "grown up" and that he was "a bad guy." And M.B. said that Tim lived with her baby cousin.

In her October 2018 deposition, M.B. stated her first and last name, her age, and her birthday. She knew that you got in trouble if you told a lie at school. Counsel for the State asked M.B., "[I]f I said that I have purple hair right now, would that be real or not real?" M.B. responded, "Not real. That's fake." She was also able to accurately respond to a hypothetical by stating that what the character said in the hypothetical was "[n]ot real" and was a "lie." When asked if she knew that they were only going to talk about the truth, the deposition transcript notes that M.B. nodded her head in response. During questioning by defense counsel, the following colloquy was had.

> Q (by defense counsel). . . . Has someone touched you on your private parts?
> A (by M.B.). Yes.
> Q. Okay. And who touched you on your private parts?
> A. Tim.
> Q. Okay. And --
> A. He does every day when I see him.
> Q. Can you tell me -- and how often do you see Tim?
> A. A long day when my mom was gone.
> Q. Okay. And when was -- was that recently?
> A. It was just pretending.

Q. Oh, you were just pretending?

A. (Witness nods head.)

Q. Is that a yes?

A. Yeah.

Q. Okay. So you are saying now -- I guess I am a little confused. Are you saying there's someone named Tim that did touch you on your private parts, or that was just pretending?

A. Just pretending.

Q. Okay. And when did you see Tim before?

A. A long time. My mom took me there.

Q. Do you remember very recently? Have you seen -- did you see him like yesterday or the day before?

A. The day before.

Q. And what does Tim look like?

A. He's yellow.

. . . .

Q. . . . And does your mom know Tim?

A. (Witness shakes head.)

Q. Is that a no?

A. No.

Q. Okay. And is that because Tim is pretend?

A. Uh-huh.

. . . .

Q. And do you remember, was it a spec -- and do you remember where you were with Tim?

A. At his house.

. . . .

Q. Okay. And do you remember how old you were?

A. Three.

. . . .

Q. Where are the places that Tim touched you?

A. At jail.

. . . .

Q. Okay. What part of you did he touch?

A. Everywhere.

Q. Everywhere. And who did you tell about this?

A. Mom.

. . . .

Q. Did you tell her right away after?

A. Right away.

Q. Okay. And did you tell your dad.

. . . .

A. Yeah.

Q. Okay. Who did you tell first, your mom or your dad?
A. My dad.
. . . .
Q. Okay. Coming back you said Tim touched you everywhere; is that right?
. . . .
A. Yeah.
Q. Okay. And did he touch what you call your cuca?
. . . .
A. Yeah.
Q. Okay. And how did he touch that?
A. I was at the school.
. . . .
Q. Did you ever see Tim after the time that he touched you?
. . . .
A. Yeah.
Q. Okay. Do you remember the last time you saw Tim?
A. Yeah.
Q. When was that?
A. December [date] when I was three.
Q. Your third birthday party; is that right?
A. Yeah.
. . . .
Q. You told me [Tim] touched you everywhere; is that right?
A. Yeah.
Q. Do you know, did he use his hands?
A. Yeah.
Q. Okay. Did he use his mouth at all?
. . . .
A. No.
. . . .
Q. Did Tim have his clothes on when he touched you?
A. Yeah.
Q. He did. Okay.
A. I ran away from him.
. . . .
Q. And why did you run away from him?
A. Because he was bad.
Q. Why was he bad?
A. He was mean -- he was being mean to me.
Q. How was he mean to you?
A. He was hurting me a lot, that hurts.
Q. How did he hurt you?
A. I don't know, when he touched me.

. . . .

Q. Was Tim friends with your mom?

. . . .

A. Yeah.

Q. Okay. Are they still friends?

. . . .

A. No.

. . . .

Q. Okay. How many Tims do you know?

A. One.

On redirect examination by the State, M.B. stated that Tim touched her kooka with his knee and his hands, that he touched her butt at school, and that he touched her breasts with his knee and his shoulder. She responded, "Yeah," when asked if Tim's mouth touched her kooka and breasts.

At a continued evidentiary hearing on December 19, 2018, M.B., now 5 years old, testified. Defense counsel asked M.B. if she remembered talking with him and the prosecutor before, to which she responded, "Yeah." The following colloquy then took place.

Q (by defense counsel). And you remember that you told us about many things that had happened before; do you remember?

A (by M.B.). Yeah.

Q. And when you first started talking about it, you told us that it was all pretend; do you remember that?

A. Yes.

Q. Okay. And then, later, you told us there were things that weren't pretend; do you remember that?

A. Yes.

Q. Okay. Why did you say that it was -- sometimes it was pretend and sometimes it was not pretend?

A. Because -- this is why I pretend it's not.

Q. Okay. Were there things -- sorry?

A. Because pretend is -- to pretend is not purple hair.

Q. Okay. So -- are sometimes the things you're going to tell us -- are they going to be pretend? Is that a yes?

A. Yes.

Q. Okay. And you understand, though, that you promised to tell the truth; is that right?

A. Yes.

Q. Okay. But even though you promise to tell the truth, maybe you'll tell us some pretend things; is that right?

A. Yes.

Q. Okay. And did -- has anyone told you what an oath is? That's a no?

A. No.

Q. Okay. Did anyone tell you that when you promise to tell the truth in court it's different from some other promises you give in other places? Is that -- did anyone talk to you about this?

A. No.

Q. Okay. Do you understand why we're here --

A. No.

Q. -- today? Okay. And you understand what a courtroom -- where we are? What a courtroom does?

A. No.

. . . .

Q. Okay. Do you know what a judge does?

A. No.

Q. Okay. Do you understand that we're interested in finding out the truth from you and that here people expect you to tell the truth and only the truth?

A. No.

On cross-examination, the following colloquy took place between the prosecutor and M.B.

Q (by the prosecutor). . . . How, when you were asked questions about pretend, you said "purple hair"; is that right?

A (by M.B.). Yeah.

Q. And when we -- before we came up here, did we talk about what was pretend and what was real?

A. Yeah.

Q. Okay. So if I told you today that I had purple hair, would that be real or not real?

A. Not real.

Q. Okay. So do you know that when you're in here you have to talk about things that really happened? Do you understand that? Is that a yes?

A. Yes.

Q. Okay. And what if I told you, "[M.B.], you're wearing a pink shirt today," would that be real or not real?

A. Not real.

Q. Okay. Because what color shirt are you wearing?

A. A uniform.

Q. A uniform. Okay. Very good. And my hair's not really purple. It's yellow; isn't it? Is that a yes?

A. Yes.

M.B. was then able to state that she was 5 years old, when her birthday was, and what school she attended.

On redirect by defense counsel, M.B. was asked if she clearly remembered things that happened when she was 3 years old, and M.B. said, "No." And when asked if she could really tell people the truth about things that happened when she was three, she said, "Yes."

In its order filed on January 7, 2019, the district court stated that it had observed M.B. testify and heard her answers to questions, and believed she was competent to testify. The court further stated that any issue Reyes may have with M.B.'s inability to accurately remember and narrate certain events did not go to her competency, but were credibility issues for the jury to consider. The court overruled Reyes' motion to exclude M.B. as a witness at trial.

## 2. TRIAL

Trial commenced on January 14, 2019. Neither the video recording of M.B.'s April 2018 forensic interview or a copy of M.B.'s October deposition were offered or received into evidence. A summary of the evidence relevant to this appeal follows.

Candice S. is M.B.'s mother. Candice testified that M.B. was born on a specified date in 2013, and was 5 years old at the time of trial. Candice described M.B. as strong-willed, honest, and "very smart."

Candice testified that Reyes was a former friend and former boyfriend. She met Reyes when she was pregnant with M.B. Candice and Reyes were friends for a few years, but officially started dating in the fall of 2016, when M.B. was about 2½ years old. Candice stated that the three of them would spend time together. Reyes would watch M.B. when Candice went to work or was too tired, and he would take M.B. to daycare; he babysat M.B. alone "about four or five times." Candice described Reyes and M.B.'s relationship as "open" and "loving," and agreed that M.B. seemed to enjoy her time with Reyes, whom M.B. sometimes referred to as "Yellow." Candice and Reyes stopped dating in May 2017, and no longer spent time together; M.B. last had contact with Reyes in May. When asked if M.B. spent time with any individuals named Tim or Timothy (other than the defendant) in 2016 or 2017, Candice said, "No." Candice learned some "concerning" things in January 2018, when M.B. was 4 years old (there was no elaboration as to what those concerning things were).

According to Candice, on April 5, 2018, M.B. was staying with her father when his house was raided by police; the lady he was staying with "went to jail for [] possession of drugs." M.B. was taken to Project Harmony for an interview. M.B. was removed from Candice's home from April to September.

Amy Cirian is a forensic interviewer at Project Harmony, a child advocacy center that conducts evaluations of children who may have experienced abuse or neglect. She testified that in each forensic interview, "we cover sexual abuse, physical abuse, domestic violence, and witness to domestic violence," and we "screen for child pornography . . . as well as drugs and alcohol and neglect in their environment." In Cirian's experience, "children do not disclose [sexual abuse] right away"; "[a] lot of kids never disclose until adulthood[,] [a]nd, most of the time, they have a delayed disclosure." When asked if, based on her training and her experience in interviewing children the same age as M.B., if she would expect a 4-year-old child to be able to remember and relate specific dates and times that abuse had occurred, Cirian responded, "No, I wouldn't expect that." She explained, "Kids really struggle with dates and times. . . . And if abuse if frequent and ongoing, their different episodes of abuse can kind of blur together."

Cirian interviewed M.B. on April 5, 2018; M.B. was 4 years old at the time. During the interview, M.B. "was very active" and was "difficult to keep on task at times." When asked if M.B. was able to provide any sensory details in the interview, Cirian responded, "Yes." (Cirian did not

testify about what M.B. disclosed in the forensic interview.) After the forensic interview, M.B. received a medical exam. Cirian provided a summary of what M.B. had disclosed in the forensic interview to the medical examiner.

Ashley Harris is a nurse practitioner and a medical program manager at Project Harmony. She conducts medical evaluations of children that come to the facility for any suspected abuse or neglect. She examined M.B. on April 5, 2018. Harris described M.B.'s demeanor as "very talkative and very active," "slightly distracted," and "really curious about everything in the exam room." Harris testified that during the exam, M.B. was able to correctly identify the animals and colors they discussed, and correctly state her birthday. M.B. was also able to identify and point to her various body parts. According to Harris, M.B. "was able to identify her breasts as her 'boobies,' her vagina as her 'kooka,' and her buttock as her 'butt.'" M.B. also identified a penis as a boy's kooka. When Harris asked M.B. if anyone had ever touched her boobies, M.B. replied, "'Tim.'" And when Harris asked M.B. what Tim touched her boobies with, M.B. said his hands. Harris asked M.B. who Tim was, and she replied, "'The one who was a bad guy.'" When Harris asked M.B. if anyone had touched her butt, M.B. replied, "'Tim.'" And when Harris asked M.B. what Tim touched her butt with, M.B. said his hands. Harris said she followed up by asking if Tim touched M.B.'s butt on top of clothes or on top of skin, and M.B. told her it was on top of skin; when asked how many times Tim touched her butt, M.B. told her "'[o]ne time.'" Harris also asked M.B. if anyone had ever touched her kooka, and M.B. replied, "'Tim.'" When Harris asked M.B. what Tim touched her kooka with, M.B. said his hands. Harris testified, "I asked her if that was the inside of her kooka or the outside of her kooka, and she replied to me that it was the inside." Harris asked M.B. how it made her kooka feel when he touched her, and M.B. said it tickled. Harris asked M.B. if Tim touched her with any other body parts, and M.B. replied, "'I just touched him.'" And when Harris asked where M.B. touched Tim, M.B. "pointed to her thigh, her vaginal area, and her buttock area, and then she had replied, "'I just touched his kooka'"; M.B. said she touched Tim's kooka with her hands. Harris asked M.B. if someone's mouth had ever touched her on her body, and M.B. said Tim; when asked where he touched her, M.B. "pointed to, again, her vaginal area and her buttock." Harris asked M.B. what his mouth did when it touched her body, and M.B. replied, "'It tickled.'" Harris asked M.B. if the touching on her body with his mouth was on top of skin or on top of clothes and M.B. told her, "'On top of skin.'" M.B. also said her mouth touched Tim "'[o]n his body.'" M.B. denied that any boy kooka had touched her body. Harris stated that M.B. tested negative for sexually transmitted infections. Additionally, given the abuse that M.B. described, Harris did not expect to find injury "[b]ecause most examinations [about 95 percent] of a child with suspected sexual abuse are normal."

Makayla Styles is a detective in the child victim unit at the Omaha Police Department. Styles testified that the child victim unit is housed at Project Harmony, but that the two are separate entities. Styles stated that on April 5, 2018, one of the Project Harmony staff informed her that M.B. disclosed some sexual abuse during a forensic interview, so Styles went to observe the remainder of the interview; she later went back and watched the entire interview on DVD. After M.B.'s medical exam, Styles received clinical notes from Harris, and what Styles read in the medical notes was consistent with what M.B. disclosed during the forensic interview. Later, Styles met with Candice who was "upset and emotional" after being told that M.B. disclosed sexual abuse. Styles talked with Candice about who M.B. had identified as her abuser, and Candice was

able to corroborate that that person had been in their life. Styles began an investigation of Reyes, and learned Reyes was born in 1972.

M.B. was called to the stand to testify. Upon inquiry of the district court, M.B. affirmed that she knew the difference between the truth and a lie, and she promised to tell the truth. She testified that she was 5 years old and in Pre-K at school. On direct examination, M.B. answered some basic questions about her name, her parents' names, the name of her school, and her teacher's name. She also answered questions about whether certain statements by the prosecutor (e.g., "I have pink hair") were the truth or lies. M.B. also promised to tell only things that were true.

M.B. stated that "Tim" was sitting next to defense counsel. When asked how she knew it was Tim, M.B. stated, "Because I went at [sic] his house." When asked if her mother also knew Tim, M.B. said, "No." When asked why M.B. went to Tim's house, M.B. responded, "Because I met his baby brother."

M.B. testified that a "kooka" and a "behind" are private parts. (Candice testified that M.B. refers to her vagina as her "kooka.") The following colloquy then took place between the prosecutor and M.B.

Q (by prosecutor). -- has anyone touched your kooka?

A (by M.B.). Yes

Q. Who's touched your kooka?

A. Tim.

Q. Okay. And your behind that you said is where you're sitting on the chair . . . has anyone touched your behind?

A. Yes.

Q. Who's touched your behind?

A. Tim.

Q. O.K. [M.B.], do you remember talking to your mom about what Tim had done to you?

A. Yes.

Q. Okay. And did you feel safe talking to your mom about what Tim had done?

A. Yes.

Q. Do you remember talking to a doctor about what Tim had done to you?

A. Yes. I mean yes.

Q. Okay. And was the doctor there to make sure you were safe and healthy?

A. Yes.

Q. And did you tell the doctor what Tim had done to you?

A. Yes.

Q. Okay. How did that make you feel when Tim touched your kooka?

A. Mad.

Q. And why were you mad?

A. I don't know.

Q. Okay. And how did it make you feel when Tim touched your behind?

A. Mad.

Q. Okay. What did you do when Tim touched you in your private parts?

A. I don't know.

Q. Okay. Were you scared when Tim touched you there?

A. Yes.

Q. And did you tell your mom what happened?

A. Yes.

On cross-examination, the following colloquy took place between defense counsel and M.B.

Q (by defense counsel). Now, some of the things you're telling us are pretend; is that right?

A (by M.B.). Yes.

Q. Okay. And you described -- I'm sorry. You said that Tim did this to you; right?

A. Yes.

. . . .

Q. All right. And the last time you ever saw this Tim was at your third birthday party; isn't that right?

A. No.

Q. No? Now, you remember that you were in a room with me and [the prosecutor], who was just asking you some questions, and a woman that was typing on a computer; do you remember that?

A. Yes.

Q. Okay. And during that time I asked you when the last time you saw Tim was; do you remember me asking you that?

A. Yes.

Q. And didn't you tell me the last time you saw Tim was at your third birthday party?

A. No.

Q. I'm sorry. Was that a yes?

A. No.

Q. Okay. You don't remember telling me that that was the last time you saw Tim?

A. No.

Q. Okay. And when this Tim touched you, he did not -- he used his hands? Yes?

A. Yes.

Q. But he did not use his mouth; correct?

A. No.

Q. Okay. That's a "no, he did not"; is that what you mean?

A. No.

Q. Okay. And the part of his body that touched your kooka was his -- was his knee; is that correct?

A. Yes.

Q. Okay. And the place that -- and you said Tim touched your butt; is that right?

A. Yes.

Q. And he did this at your school; is that right?

A. Yes. No, no, no.

Q. So that there was someone named Tim that touched you on your private parts -- that was just pretending, wasn't it?

A. Yes.

Q. Okay.

Then, on redirect the following colloquy took place between the prosecutor and M.B.

Q (by prosecutor). [M.B.], I just have a few more questions for you. . . . We were talking earlier about pretending and saying I had pink hair. Is that pretend or is that real?

A (by M.B.). Pretend.

Q. That's pretend, because what color is my hair really?

A. Yellow.

Q. Okay. It's yellow. So when you talked about Tim touching you on your kooka and on your butt, is that pretend or is that real?

A. Real.

Q. Okay. And when you talked to Mommy about Tim touching you, were you telling her the truth?

A. Yes.

Q. Okay. And what about when you talked to the doctor about Tim touching you, were you telling the doctor the truth?

A. Yes. Yes, yes.

After the State rested its case, the defense was granted permission to read a select portion of M.B.'s October 2018 deposition into the record. Referring to a specific page and line number, defense counsel stated he asked M.B.:

Q. Okay. Do you remember the last time you saw Tim?

[M.B.] answered, "Yeah."

I then asked, "When was that?"

[M.B.] answered, "[specified date in December], when I was three."

I asked her: "Third birthday party; is that right," and [M.B.] said, "Yeah."

The foregoing was all that defense counsel read into the record. The defense presented no other evidence.

### 3. Jury Verdict, Conviction, and Sentence

On January 16, 2019, the jury found Reyes guilty of first degree sexual assault of a child and third degree sexual assault of a child; the district court entered judgment accordingly. On March 26, the district court sentenced Reyes to consecutive sentences of 40 to 50 years' imprisonment for the first degree sexual assault of a child and 3 years' imprisonment for the third degree sexual assault of a child.

Reyes appeals.

### III. ASSIGNMENTS OF ERROR

Reyes assigns that (1) the district court abused its discretion when it ruled the child witness was competent to testify, (2) there was insufficient evidence to support his convictions, and (3) his trial counsel provided ineffective assistance.

### IV. STANDARD OF REVIEW

The question of competency of a child witness lies within the discretion of the trial court, and that determination will not be disturbed in the absence of an abuse of discretion. *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

### V. ANALYSIS

#### 1. CHILD WITNESS

Reyes asserts that the district court abused its discretion by permitting the State to call M.B. to testify "when she was not competent to do so." Brief for appellant at 15.

Neb. Evid. R. 601, Neb. Rev. Stat. § 27-601 (Reissue 2016), states, "Every person is competent to be a witness except as otherwise provided in these rules." The rules do not provide an exception for child witnesses. The question of competency of a child witness lies within the discretion of the trial court, and that determination will not be disturbed in the absence of an abuse of discretion. *State v. Earl, supra*. The question as to the competency of a witness must be determined by the court, while the credibility and weight of the testimony are for the jury to determine. *Id*.

While no certain age has been deemed to be the age at which a child becomes competent to testify in a court of law, the court generally takes into consideration whether he or she is able to receive correct impressions by the senses, to recollect and narrate accurately, and to appreciate the moral duty to tell the truth. *Id*. See, also, *In re Interest of M.L.S.*, 234 Neb. 570, 452 N.W.2d 39 (1990) (no age below which child presumed incompetent to testify).

In *State v. Earl, supra*, Earl was charged with first degree sexual assault. The 6-year-old victim was allowed to testify at trial over Earl's objection to the child's competency as a witness. On appeal, the Nebraska Supreme Court noted that the child was able to accurately perceive and

convey relevant information. He was able to report his name, his age, his street and city, his sister's name and age, his school and grade, the names of his teacher and principal, and the name of his father's workplace. While he was not able to identify the name of his mother's workplace, he did describe her occupation. The child correctly answered a number of questions about the distinction between telling the truth and lying. The child was not able to eloquently define the concepts of lying, the truth, and a promise, but knew that lies were bad and that the truth was good; he demonstrated that he could distinguish between truths and untruths, and he promised to tell the truth in court. The Nebraska Supreme Court found that the child adequately demonstrated that he was able to receive correct impressions by his senses, could recollect and narrate intelligently, and appreciated the moral duty to tell the truth. Accordingly, the Nebraska Supreme Court found no abuse of discretion in the district court's determination that the child was a competent witness.

Other Nebraska cases have also addressed the competency of child witnesses. In *In re Interest of M.L.S., supra*, the juvenile court held that a 4-year-old girl who was the victim of a sexual assault was competent to testify. There, the victim was able to testify as to her and her father's first names (but not their last name), her age and date of birth; she was able to identify the defendant, differentiate between truth and falsehood, and understood the consequences of lying. She promised to tell the truth and was able to explain the details of the sexual assault. Based upon these facts, the Nebraska Supreme Court affirmed the trial court's finding of competency. See, also, *State v. Roenfeldt*, 241 Neb. 30, 35, 486 N.W.2d 197, 202 (1992) (10-year-old victim of sexual assault was competent to testify; "[w]hile the effect of the alleged assault on her mental and emotional difficulties may have compromised her judgment of both the timing of the sequence of events and certain anatomical references, no evidence suggested that these difficulties rendered [her] incompetent to testify to the crimes committed against her"); *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981) (8-year-old boy who had functional mental age of 3 to 5 years was competent to testify); *In re Interest of O.L.D. and M.D.D.*, 1 Neb. App. 471, 499 N.W.2d 552 (1993), (4-year-old girl who was subjected to sexual contact by father was competent to testify; she demonstrated knowing difference between truth and lie, she promised to tell truth, and was able to recall details of sexual contact).

In this case, M.B. was able to state her name, her parents' names, her age and birthday, her grade in school, the name of her school, and her teacher's name. M.B. affirmed that she knew the difference between the truth and a lie and she promised to tell the truth. She also answered questions about whether certain statements by the prosecutor (e.g., "I have pink hair") were "real" or "fake," the "truth" or a "lie." M.B. promised to tell only things that were true. She was also able to convey relevant information about the facts of the sexual assaults.

Reyes points out that on direct examination, M.B. indicated that she promised to tell the truth but would still be telling things that were pretend. However, on cross-examination, M.B. reiterated that when she said Tim touched her "kooka" and her "butt," that was "real." Reyes also argues that M.B. was not competent to testify because she "lack[ed] the ability to recollect and narrate accurately or to appreciate the moral duty to tell the truth," she "continually contradict[ed] previously provided testimony," and she "did not understand the court process or that she owed a higher duty to tell that [sic] truth in court over her everyday promise to tell the truth." Brief for appellant at 17.

In response, the State asserts that "[w]hile M.B. offers unclear or inconsistent testimony, and her concept of truth and truth telling may have been often oddly framed, the finding of the district court was not an abuse of discretion." Brief for appellee at 20. During the State's cross-examination at the competency hearing, "M.B. demonstrated her ability to discern between 'real' and 'pretend' statements," and "[i]n contrast to the examination by the State, the questioning by defense counsel was not particularly developmentally appropriate in its use of complex questions and concepts." *Id*. See *State v. Miner*, 216 Neb. 309, 343 N.W.2d 899 (1984) (no abuse of discretion to allow 5-year-old's testimony when conflicting testimony was caused by nature of defense counsel's questions and manner in which they were propounded, which created question of credibility and not competency).

While M.B. may not have known what an oath was, that was not required. See *State v. Earl*, 252 Neb. 127, 132, 560 N.W.2d 491, 495 (1997) ("[i]nability to define such words as 'testimony,' 'oath,' or 'obligation of an oath' is not determinative of want of capacity of a child to be a witness. It is sufficient if, without being familiar with the use and meaning of such words, [the child] has an adequate sense of the impropriety of falsehood, sufficient intelligence, and a proper appreciation for the obligation of an oath"). M.B. demonstrated her ability to distinguish between "real" and "fake," the "truth" and a "lie." Although Reyes asserts that "M.B. [who was 5 at the time of trial] does not clearly remember things that happened when she was three," brief for appellant at 17, that goes to M.B.'s credibility, not her competency. See *Rueger v. Hawks*, 150 Neb. 834, 36 N.W.2d 236 (1949) (where, at time of automobile accident, children in one automobile were nearly 6 years of age, and at time of trial they were nearly 7 years of age, trial court did not abuse its discretion in permitting children to testify).

The district court had the opportunity to review M.B.'s Project Harmony interview and her deposition, and heard her testimony at the evidentiary hearing. The court believed she was competent to testify. The court's ruling was not an abuse of discretion. As noted by the district court, any issue Reyes had with M.B.'s inability to accurately remember and narrate certain events did not go to her competency, but were credibility issues for the jury to consider.

2. Sufficiency of Evidence

Reyes argues that there was insufficient evidence in the trial record from which a reasonable jury could conclude that he was guilty beyond a reasonable doubt of first and third degree sexual assault of a child.

(a) First Degree Sexual Assault of Child

Pursuant to § 28-319.01(1)(a), a person commits sexual assault of a child in the first degree when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-318(6) (Reissue 2016) defines "[s]exual penetration" as:

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. . . .

- 14 -

Harris testified that during her medical examination of M.B., Harris asked M.B. if anyone had ever touched her kooka (M.B.'s word for vagina), and M.B. replied, "'Tim.'" When Harris asked M.B. what Tim touched her kooka with, M.B. said his hands. Harris testified, "I asked her if that was the inside of her kooka or the outside of her kooka, and she replied to me that it was the inside." Harris asked M.B. how it made her kooka feel when he touched her, and M.B. said it tickled. Because any intrusion, however slight, of any part of the actor's body into the genital or anal openings of the victim's body counts, "Tim" using his hands to touch the "inside" of M.B.'s "kooka" qualifies as "sexual penetration" pursuant to § 28-318(6).

The testimony at trial revealed that M.B. was born in 2013, and that Reyes was born in 1972. Accordingly, M.B. was under 12 years of age and Reyes was at least 19 years of age or older at the time the offense was committed. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Reyes of first degree sexual assault of a child.

### (b) Third Degree Sexual Assault of Child

Pursuant to § 28-320.01(1) and (3), a person commits sexual assault of a child in the third degree if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older, and the actor does not cause serious personal injury to the victim. Sexual contact is defined under § 28-318(5) as

> the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01.

"Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts." § 28-318(2).

During Harris' medical examination of M.B., M.B. disclosed that "Tim" touched her "butt" with his hands on top of her skin and that he touched her "kooka" (vagina) with his hands; M.B. also disclosed that "Tim's" mouth touched her on top of her skin, and when asked where, M.B. pointed to her vaginal area and her buttock. M.B. also reported touching "Tim's" "kooka" (her word for a penis) with her hands. There was no indication that M.B. sustained any serious personal injury. Any one of the foregoing qualifies as "sexual contact" pursuant to § 28-318(5).

And as noted previously, the testimony at trial revealed that M.B. was born in 2013, and that Reyes was born in 1972. Accordingly, M.B. was 14 years of age or younger and Reyes was at least 19 years of age or older at the time the offense was committed. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Reyes of third degree sexual assault of a child.

## 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Reyes claims that his trial counsel provided ineffective assistance because counsel failed to cross-examine three witnesses and because counsel did not allow Reyes to testify on his own behalf.

Reyes has new counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Weathers*, 304 Neb. 402, 935 N.W.2d 185, (2019). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Weathers, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The two prongs of this test may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *Id.*

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *Id.*

### (a) Failure to Cross-Examine Witnesses

Although Reyes' trial counsel did cross-examine Candice and M.B., he did not cross-examine Cirian, Harris, or Styles. Reyes asserts that the evidence provided by those three witnesses was prejudicial to him and the witnesses should have been cross-examined by his counsel. More specifically, he claims Cirian should have been cross-examined regarding "the length of her interview and the lack of specificity regarding a timeline for the alleged assault," "the behaviors of the minor child in the interview and her inability to track the conversation appropriately," and "the lack of timely reporting and the delay regarding the same which if done appropriately would infer doubt in the accuracy and veracity of the delayed claims by M.B." Brief for appellant at 23. Reyes claims Harris should have been cross-examined regarding "her intent to prove the state's allegation of penetration when informed by the forensic interviewer," and counsel should have "delve[d] into specifics of the interview conducted by the medical professional which ultimately was the only elicited testimony about penetration." *Id.* Reyes claims that trial counsel should have objected to or alternatively cross-examined Styles about her investigative findings.

We cannot determine on the appellate record before us the reasons why Reyes' trial counsel did not cross-examine Cirian, Harris, or Styles. Accordingly, we can determine neither deficiency nor prejudice as to this claim. We find that the record is insufficient for us to address this claim on direct appeal.

### (b) Failing to Allow Reyes to Testify

Reyes also claims that his trial counsel did not allow him to testify on his own behalf.

At trial, the district court asked if the defense had any other evidence, and after conferring with his client, there was a sidebar with the court, during which the following colloquy was had:

> THE COURT: . . . Have you advised your client on the record -- you want to make a record that he has a right to testify and chooses not to?
> [Defense Counsel]: I don't know if I need to make a record. In the interest of time --
> THE COURT: You talked to your client?
> [Defense Counsel]: I have advised my client of his right to testify.
> THE COURT: And he has chosen not to?
> [Defense Counsel]: And he has chosen not to.
> THE COURT: All right. Very good.

The case then proceeded to a jury instruction conference followed by closing arguments.

Reyes now contends that, "At the conclusion of the state's evidence, [he] insisted of trial counsel that he be allowed to testify on his own behalf based on the evidence provided at trial," but that "trial counsel advised him that they had decided in trial preparation that [Reyes] would not testify and that [counsel] would not allow [Reyes] to change that trial strategy." Brief for appellant at 24.

The record before us is not sufficient to address Reyes' claim that he informed his trial counsel that he wanted to testify on his own behalf prior to the close of the defense's presentation of evidence. Accordingly, we can determine neither deficiency nor prejudice as to this claim. We find that the record is insufficient for us to address this claim on direct appeal.

### 4. PLAIN ERROR

Although not raised by either party, we must note an issue of plain error in Reyes' sentence. An appellate court may, at its option, notice plain error. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). Plain error may be found on appeal when an error unasserted or uncomplained of at trial is plainly evident from the record, affects a litigant's substantial right, and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id*. A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review. *Id*.

Reyes was convicted of first degree sexual assault of a child (count I), a Class IB felony. In this case, the Class IB felony was punishable by a mandatory minimum of 15 years' imprisonment and a maximum of life imprisonment. See, § 28-319.01(2); Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). The district court sentenced Reyes to 40 to 50 years' imprisonment on count I. This sentence was within the statutory range.

Reyes was also convicted of third degree sexual assault of a child (count II), a Class IIIA felony. He was sentenced to 3 years' imprisonment on this count; and his sentences in counts I and II were to be served consecutively. A Class IIIA felony is punishable by up to 3 years' imprisonment and 18 months' postrelease supervision, a $10,000 fine, or both; there is no minimum sentence of imprisonment, but there is a minimum of 9 months' postrelease supervision if imprisonment is imposed. See § 28-105. However, a person sentenced to imprisonment for a class IB felony and a Class IIIA felony, either concurrently or consecutively, shall not be subject to postrelease supervision. See § 28-105(6). Additionally, Neb. Rev. Stat. § 29-2204.02(4) (Reissue 2016) provides that for any sentence of imprisonment for a Class IIIA felony for an offense committed on or after August 30, 2015, imposed consecutively or concurrently with a sentence of imprisonment for a Class IB felony, the court shall impose an indeterminate sentence within the applicable range in § 28-105 that does not include a period of postrelease supervision. See, also, *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018) (indeterminate sentence is minimum term and maximum term or range of time for which defendant is to be incarcerated, even if minimum and maximum number are same).

The district court sentenced Reyes to 3 years' imprisonment for the third degree sexual assault of a child (count II), with the sentence consecutive to count I, a class IB felony. However, the sentence for count II needed to be an indeterminate sentence pursuant to § 29-2204.02(4), because Reyes was also sentenced on a class IB felony; the court's imposition of a determinate sentence, rather than an indeterminate sentence, on count II constitutes plain error. Given this plain error, we vacate Reyes' sentence for his conviction on count II and remand that count for resentencing. See *State v. Thompson*, 301 Neb. 472, 919 N.W.2d 122 (2018) (finding plain error and vacating sentences and remanding cause for resentencing where sentences did not comply with § 29-2204.02(4)).

## VI. CONCLUSION

For the reasons stated above, we affirm Reyes' convictions. However, we find plain error as to the sentence on count II. Thus, we vacate the sentence imposed on count II, and we remand the matter to the district court for resentencing on count II in accordance with § 29-2204.02(4).

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.